THORNTOWN TELEPHONE
COMPANY, INC.,
Petitioner,

v.

STATE BOARD OF TAX COMMISSION-
ERS, Jack L. New, Chairman, Gordon
E. McIntyre, Member, Sandra K. Bick-
el, Member, Respondents.

TRI–COUNTY TELEPHONE
COMPANY, INC.,
Petitioner,

v.

STATE BOARD OF TAX COMMISSION-
ERS, Jack L. New, Chairman, Gordon
E. McIntyre, Member, Sandra K. Bick-
el, Member, Respondents.

Nos. 49T05–9007–TA–00032,
49T05–9007–TA–00033.

Indiana Tax Court.

March 13, 1992.

Daniel P. Byron, Jeffrey T. Bennett, McHale, Cook & Welch, P.C., Indianapolis, for petitioners.

Linley E. Pearson, Atty. Gen., Joel Schiff, Marilyn S. Meighen, Deputy Attys. Gen., Indianapolis, for respondents.

FISHER, Judge.

The Petitioners, Thorntown Telephone Company, Inc. (Thorntown) and Tri–County Telephone Company, Inc. (Tri–County), appeal the State Board of Tax Commissioners' (State Board) final assessments of their distributable property for the year 1990. Thorntown and Tri–County ask the court to set aside their respective final assessments and to require the State Board to determine their assessments applying the economic obsolescence adjustment used in the assessment of railroad[1] property. Thorntown's and Tri–County's appeals are

---

1. Several types of railroads are defined as classes of public utility companies including: railroad companies, railroad car companies, sleeping car companies and street railway com-
panies. IND.CODE 6–1.1–8–2(9) through (12). In this opinion, the term "railroad" refers to all classes of railroad public utility companies where applicable.

considered together because they address the same issues.

## ISSUES

I. Whether the State Board must apply the economic obsolescence adjustment from the railroad property assessment methodology in the assessment of telephone property?

II. Whether the State Board must consider applying an adjustment for economic obsolescence in assessing Thorntown's and Tri–County's property?

## DISCUSSION AND DECISION

### I.

The court's standard of review of the State Board's final assessments of public utility company property is set by statute:

> When a public utility company initiates an appeal under section 30 of [IC 6–1.1–8], the tax court may set aside the state board of tax commissioners' final assessment and refer the matter to the board with instructions to make another assessment if:
>
> > (1) the company shows that the board's final assessment, or the board's apportionment and distribution of the final assessment, is clearly incorrect because the board violated the law or committed fraud; or
> >
> > (2) the company shows that the board's final assessment is not supported by substantial evidence.

IND.CODE 6–1.1–8–32.

"The property owned or used by a public utility company shall be taxed in the manner prescribed in [IND.CODE 6–1.1–8]." IND.CODE 6–1.1–8–1. IC 6–1.1–8–2 defines a number of different classes of pub-

lic utility companies. Railroads and telephone companies are designated as different classes of public utility companies. IC 6–1.1–8–2(9) through (12) and (14).

Indiana's statutes governing the assessment of public utility company property involve a centralized assessment scheme [2] in which the State Board assesses the operating property (distributable property) used in providing utility services: the State Board "shall assess the *distributable property* which . . . is owned or used by a public utility company." IND.CODE 6–1.1–8–25 (emphasis added). The non-operating property (fixed property) of public utility companies is assessed locally by township assessors. IND.CODE 6–1.1–8–24(a). When calculating the value of distributable property, the State Board first considers the total value (unit value) [3] of a public utility company's property and then subtracts the value of fixed property: "The value of the distributable property of a public utility company [4] . . . equals the remainder of: (1) the *unit value* of the company; minus (2) the value of the company's *fixed property.*" [5] IC 6–1.1–8–26(a) (emphasis added).

The dispute in this case arises from changes in State Board's method of computing unit value. Before 1988, the State Board computed the unit value for all public utility companies using a two-factor formula, consisting of a property factor and an income factor:

> (a) For purposes of this section, '*property factor*' means the value of all tangible property of a company determined under 50 IAC 5–4–3. . . .
>
> (b) For purposes of this section, '*income factor*' means the average net operating income of a company capitalized at a uniform rate as determined by the tax board, with respect to each utility company within the same classification, taking

---

2. *See generally* J. Amdur, *Property Taxation of Regulated Industries,* 40 TAX LAWYER 339 (1987) (discussing principles of property taxation of public utility companies).

3. "The term 'unit value' means the total value of all the property owned or used by a public utility company." IC 6–1.1–8–2(16).

4. The general formula for the computation of distributable property of "railroad car compa-

nies" differs from that of other public utility companies. *See* IND.CODE 6–1.1–8–26(a).

5. Because the different classes of public utility companies conduct different types of businesses, fixed property is defined individually for each class. *See* IND.CODE 6–1.1–8–5; IND. CODE 6–1.1–8–6 through 8–18.

into account the method of depreciation used by the company.

. . . .

(d) The 1987 total unit value as a going concern of a public utility company shall be determined as follows:

(1) If the 1987 income factor of the company exceeds its 1987 property factor, the 1987 total unit value is the average of those income and property factors minus three-fourths of the amount by which the income factor exceeds that average.

(2) If the 1987 property factor of the company exceeds its 1987 income factor, the 1987 total unit value is the average of those income and property factors plus three-fourths of the amount by which the property factor exceeds that average.

(e) *The total unit value as a going concern of a public utility company for 1988 and thereafter is equal to the property factor of the company for the year in question.*

50 I.A.C. 5–4–2 (filed Nov. 19, 1985) (emphasis added).

Because the income factor was calculated, in part, by capitalizing average net operating income, it reflected losses in the value of public utility company property with depressed earning capacity. Thus, the loss of the income factor in 1988 potentially resulted in higher assessments for public utility companies.

In 1988, 50 I.A.C. 5–4–2 was amended to reflect the removal of the income factor from the computation of unit value. The amended version of this regulation states in relevant part:

For purposes of this section, 'unit value' means the value of all tangible property of a company determined under 50 IAC 5–4–2.5 and 50 IAC 5–4–3 [*sections 2.5 through 3 of this rule*] (including all leased property used by the company).

50 I.A.C. 5–4–2(a) (filed Nov. 3, 1988).

Within the general framework for determining unit value under 50 I.A.C. 5–4–2, the State Board's methods of assessment vary among the different classes of public utility companies. In 1989, the State Board incorporated an economic obsolescence adjustment in its method of assessing railroad property. The economic obsolescence adjustment is calculated using a table referred to as the economic obsolescence schedule (schedule). The schedule is applied based on the ratio of operating expenses (expenses) to operating revenues (revenues). If expenses are greater than 60 percent of revenues, the schedule provides a sliding scale adjustment that reduces the percentage of property that is taxable.[6] Because the schedule is based on the ratio of expenses to revenues, its application could reduce the assessments of railroads that have property with depressed earning capacity. During 1990, the year at issue, the State Board exclusively applied the schedule to the assessment of railroad property.

Notwithstanding, when Thorntown and Tri–County provided the State Board with information for their 1990 assessments, they included calculations of expense to revenue ratios. The expense to revenue ratio for Thorntown was 87.56%, and the expense to revenue ratio for Tri–County was 76.70%. Because their expenses exceeded 60 percent of their revenues, Thorntown and Tri–County requested adjustments for economic obsolescence calculated according to the schedule.

On June 1, 1990, the State Board issued tentative assessments of Thorntown's and Tri–County's property, without the requested adjustments for economic obsolescence. Thorntown and Tri–County objected, and the State Board held a hearing on the mat-

---

**6.** This adjustment is determined by cross indexing the ratio of expenses to revenues (expressed as a percentage) with a corresponding adjustment figure on the schedule. *Petitioner's Exhibit 6* sets out the schedule:

| Expense To Revenue Ratio | Percent Taxable |
|---|---|
| 100 | 40 |
| 99 | 41 |
| 98 | 42 |
| * * * | |
| 62 | 94 |
| 61 | 97 |
| 60 | 100 |

ter on June 27, 1990. On June 29, 1990, the State Board issued orders making Thorntown's and Tri–County's tentative assessments final.

Thorntown and Tri–County contend their final assessments are clearly incorrect because the State board violated the Indiana Constitution by refusing to apply the economic obsolescence adjustment calculated under the schedule. The State Board contends, however, the Indiana Constitution does not require it to provide uniform methods of assessment for different classes of public utility companies, and, therefore, it is not required to use the economic obsolescence adjustment applied to railroad property when assessing telephone property.

The Indiana Constitution states in relevant part: "The General Assembly shall provide, by law, for a uniform and equal rate of property assessment and taxation and shall prescribe regulations to secure just valuation for taxation of all property...." *IND. CONST.*, art. X, § 1(a). "The Constitution of Indiana does not require a uniform method of valuation, but rather such regulations as shall secure a just valuation for taxation of all property." *Indiana State Bd. of Tax Comm'rs v. Lyon and Greenleaf Co.* (1977), 172 Ind. App. 272, 277, 359 N.E.2d 931, 934 (citing *The Louisville and N.A.R.R. Co. v. State ex rel. McCarty* (1865), 25 Ind. 177). Indeed, "our Supreme Court recognizes the necessity perceived by the Legislature to adopt different methods for assessment of different classes of property in order to achieve a just and uniform valuation." *Id.* (citing *Clark v. Vandalia R. Co.* (1909), 172 Ind. 409, 86 N.E. 851).

Although the State Board is not required to provide uniform methods of assessment for different classes of public utility companies, Thorntown and Tri–County contend the different methods used to assess railroad property and telephone property during the year at issue result in valuations which are not uniform or just. Thorntown

and Tri–County assert that prior to 1988, the methods for assessing all public utility companies contained the income factor, which served as the functional equivalent of the economic obsolescence adjustment because it reflected losses in value from the depressed earning capacity of property.

The State Board's methods for assessing railroad property and telephone property during the year at issue contrast sharply. In addition to the economic obsolescence adjustment, other significant differences in the methods exist. The most important are differences in the treatment of depreciation and adjustments for functional obsolescence.

During the year at issue, the railroad assessment method used "book" or "ICC" depreciation, a much slower rate of depreciation than the accelerated federal tax depreciation used by telephone companies. The different methods of depreciation resulted in higher valuations of railroad property relative to telephone property, therefore, exposing railroad property to higher tax assessments. On the other hand, railroads received an adjustment for functional obsolescence, not given to telephone companies, which reduced the value of railroad property, thus, lowering the assessments of railroad property relative to telephone property.

Thorntown and Tri–County contend the functional obsolescence adjustment given to railroads offsets the adverse effects of slower rates of depreciation on railroad property assessments, making the assessments of railroad property and telephone property relatively equal. Thorntown and Tri–County assert, therefore, that applying the economic obsolescence adjustment exclusively in the assessment of railroads unfairly results in lower overall assessments for railroad property, relative to telephone property. Moreover, Thorntown and Tri–County claim the economic obsolescence adjustment was arbitrarily applied to railroads because of the threat of litigation,[7]

---

**7.** In 1988, the State Board proposed several changes in the taxation of railroad property, including the elimination of income capitaliza-

tion under the income factor, and the railroads objected. Thorntown and Tri–County contend the economic obsolescence adjustment was

not in response to conditions causing economic obsolescence in railroad property.

The State Board acknowledges the threat of litigation brought about the application of the economic obsolescence adjustment in the assessment of railroad property. Notwithstanding, the State Board contends the economic obsolescence adjustment is necessary in assessing railroad property to reflect the negative impact on the value of railroad property from economic conditions peculiar to the railroad industry.

"Economic obsolescence is loss in value resulting from external economic factors such as decreased demand, governmental restrictions and social changes. A deduction should be made for economic obsolescence to reflect depressed earning capacity and other economic factors affecting the value of property." J. Amdur, *Property Taxation of Regulated Industries*, 40 TAX LAWYER 339, 360 (1987) (footnotes omitted). In its final orders on Thorntown's and Tri–County's assessments, the State Board notes, among other things, external economic factors present in the railroad industry that depress the earning capacity and lower the value of railroad property:

4. The Petitioners are regulated utilities with a limitation on the rate of return that can be earned. Telephone utilities generally are allowed to recover all costs of service, including a rate of return, which is not true for railroad utilities.
5. Railroads do not enjoy the complete monopoly position given to telephone

companies, such as the Petitioners. Airlines and over-the-road trucks offer direct competition not faced by the Petitioners.

. . . .

7. The schedule has been constructed solely using data from the railroad industry and is an integral part of the State Board's railroad assessment formula. . . .

*Respondents' Exhibit A.* These findings support the State Board's decision to apply the economic obsolescence adjustment in the assessment of railroad property, but not in the assessment of telephone property. Accordingly, the court finds the State Board's decision not to apply the economic obsolescence adjustment calculated according to the schedule in the assessment of telephone property neither arbitrary nor unconstitutional.

## II.

As noted above, Thorntown and Tri–County requested an economic obsolescence adjustment computed according to the schedule used in assessing railroad property. The State Board's final orders on Thorntown's and Tri–County's assessments explain why the economic obsolescence adjustment computed under the schedule is applicable to railroad property, but not to telephone property. The question remains, however, whether the State Board must consider the use of some other type of adjustment for economic obsolescence in assessing Thorntown's and Tri–County's property.[8] The State Board's fi-

adopted by the State Board in 1989 because the railroads threatened litigation over the loss of the income factor.

On the contrary, the State Board contends the economic obsolescence adjustment was a replacement for a special adjustment in the railroad formula, the 4–R adjustment. Prior to 1990, the State Board's formula for the assessment of railroads used a 4–R adjustment which lowered the assessments of railroads. The State Board's use of the 4–R adjustment was the result of a settlement agreement arising from litigation under the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. 11503(a), which prohibits states from taxing railroad property at a value bearing a higher ratio to market value than other commercial and industrial property. The settlement agreement affected the State Board's method of taxation of rail-

roads from 1981 until the expiration of the agreement in 1989. The State Board asserts the economic obsolescence adjustment was adopted in 1989 as a replacement for the 4–R adjustment, to avoid litigation over its loss.

8. Although Thorntown and Tri–County requested an adjustment for economic obsolescence calculated according to the schedule, their arguments to the State Board in support of an adjustment were framed more generally:

Failure of the [State Board] to give recognition to the Taxpayer's claim for economic obsolescence results in unequal property tax treatment and discrimination against the Taxpayer in favor of the railroad industry, which is contrary to [50 I.A.C. 5–4–2(b) ], and contrary to Indiana statutory and constitutional

nal orders do not indicate whether the State Board considered the necessity of applying some sort of adjustment for economic obsolescence in assessing Thorntown's and Tri–County's property.[9]

Indiana's statutes governing the taxation of public utility company property require the State Board to adopt rules and regulations which do not prevent making special adjustments, if necessary to ensure the fair assessment of a public utility company's property:

> (a) The state board of tax commissioners shall promulgate rules and regulations to provide equal treatment for the public utility companies within each classification. These rules and regulations may not:
>
> . . . .
>
> (2) prohibit the board from making adjustments in those cases where the rules and regulations would result in an assessment that would be unfair to the state or to the public utility company.
>
> (b) The state board of tax commissioners may adopt rules and regulations to carry out the intent and provisions of this chapter. The rules and regulations must be consistent with this chapter.

IND.CODE 6–1.1–8–42.

Under the authority of IC 6–1.1–8–42, the State Board promulgated 50 I.A.C. 5–4–2(b), which permits the State Board to use special factors to make adjustments in certain cases, if necessary to prevent unfair determinations of unit value:

> *The tax board, upon its own motion or upon petition of a company, may, in determining the just value of a company, authorize or require the use of factors other than those normally used in determining a unit value of a company as a going concern. This subsection*

applies only in situations where the use of other factors will ensure equal and nondiscriminatory treatment of all public utility companies within the same classification, *or will provide for proper adjustments to take care of special cases where failure to use other factors would result in a unit value clearly unreasonable or unfair to the state or the company.*

50 I.A.C. 5–4–2(b) (filed Nov. 3, 1988) (emphasis added). In light of IC 6–1.1–8–42 and 50 I.A.C. 5–4–2(b), it is not unreasonable to expect the State Board to make findings concerning whether an economic obsolescence factor should be used in Thorntown's and Tri–County's assessments, given their claims that adjustments for economic obsolescence are necessary to fairly determine their unit values.

IC 6–1.1–8–42 expresses the legislature's intent that the State Board make adjustments "in those cases where [its] rules and regulations would result in an assessment that would be unfair to the state or to the public utility company." IC 6–1.1–8–42(a)(2). "The legislature's intent embodied in a statute constitutes the law . . . ." *F.A. Wilhelm Constr. Co. v. Indiana Dep't of State Revenue* (1992), Ind.Tax, 586 N.E.2d 953, 956 (citing *Evansville Concrete Supply Co. v. Indiana Dep't of State Revenue* (1991), Ind.Tax, 571 N.E.2d 1350, 1353). Consideration of whether an adjustment for economic obsolescence is necessary in assessing Thorntown's and Tri–County's property is a prerequisite to making such an adjustment. Accordingly, the court finds that to give effect to the legislature's intent embodied in IC 6–1.1–8–42(a)(2), the State Board must consider whether an adjustment for economic obsolescence is necessary to prevent unfair as-

---

law requiring a uniform and equal treatment of all taxpayers for property tax assessment purposes.

  Without question, the [State Board] cannot give economic obsolescence reductions to some utilities and deny them to others when their circumstances and need for the application of the factor of economic obsolescence are precisely the same.

*Petitioners' Exhibit 7,* Verified Petition and Brief of Thorntown, at 4.

**9.** The issue determined by the State Board, as stated in its final orders on Thorntown's and Tri–County's assessments, was: "Whether the Petitioners are entitled to reductions for economic obsolescence *by means of* an economic obsolescence conversion schedule designed for railroad utilities." *Respondent's Exhibit A* (emphasis added).

sessments of Thorntown's and Tri–County's property. *Cf. Governours Square Apartments v. State Bd. of Tax Comm'rs* (1987), Ind.Tax, 528 N.E.2d 864, 867 (remanding to the State Board to consider whether factors were applicable in fixing the valuation of property where such factors were required to be considered by statute); *accord State Bd. of Tax Comm'rs v. Valparaiso Golf Club, Inc.* (1975), 164 Ind.App. 687, 689, 330 N.E.2d 394, 396.

The State Board contends that the method of depreciation used by telephone companies adequately reflects losses in the value of property from economic obsolescence and, therefore, that an adjustment for economic obsolescence is unnecessary in determining the unit value of telephone companies. Indeed, the State Board's findings acknowledge telephone companies use different methods of depreciation than railroads.[10] The State Board, however, makes no finding, nor does the record contain any evidence, that the method of depreciation used by telephone companies adequately accounts for losses in the value of property from economic obsolescence, or in particular, for losses in the value of Thorntown's and Tri–County's property from economic obsolescence.

■ In addition, depreciation of property results from three elements: physical deterioration, functional obsolescence, and economic obsolescence. J. Amdur, *Property Taxation of Regulated Industries*, 40 TAX LAWYER 339, 359 (1987). All property is subject to losses in value from economic obsolescence, and it is not disputed that

Thorntown's and Tri–County's property is subject to economic obsolescence. Several methods for quantifying economic obsolescence are recognized in the taxation of public utility company property:

> Economic obsolescence [ ] is [ ] difficult to quantify. One technique is to compare the replacement cost new, less physical deterioration, with the value of the property estimated under the income approach [that values property based on income capitalization]. If the latter amount is lower, the difference may represent economic obsolescence. . . .
>
> It has been suggested that economic and functional obsolescence may be quantified by comparing various 'quality' and 'efficiency' factors for the company with the same factors for a representative group of companies in the same industry; negative variances arguably measure the loss in income caused by the obsolescence or lack of efficiency of the company's system as compared to the others. As one court has pointed out, however, the variances may also reflect elements other than obsolescence of the property, such as quality of management, skill of the work force, competition and the like.

J. Amdur, *Property Taxation of Regulated Industries*, 40 TAX LAWYER 339, 360 (1987) (footnotes omitted).

The factors used in quantifying economic obsolescence under the methods discussed above, are factors which the State Board may consider in determining unit value pursuant to IC 6–1.1–8–26(b).[11]

---

**10.** The State Board's final orders include the following finding: "The railroad assessment formula also requires the use of ICC depreciation, a much slower rate of depreciation than the accelerated federal tax depreciation used in computing the assessments of the Petitioners." *Respondents' Exhibit A.*

**11.** The legislature has given the State Board discretion to consider a variety of factors in determining unit value:

In order to determine the unit value of a public utility company, the state board of tax commissioners may consider:

(1) book value;

(2) *cost of replacement or reproduction, less depreciation;*

(3) cost of establishing and developing the business;

(4) amount and market value or sales price of outstanding securities;

(5) valuations determined by another governmental agency or indicated by a judicial decision, including but not limited to determinations made for rate making purposes;

(6) statistics and reports prepared or filed by the company;

(7) statistics and reports prepared by another governmental agency or by a private organization if the organization is considered reliable by investors and investment dealers;

(8) *earnings capitalized at a reasonable rate; and*

For the foregoing reasons, the court finds that the State Board must consider the issue of whether adjustments for economic obsolescence are necessary in arriving at just valuations of Thorntown's and Tri–County's property and must make appropriate findings on this issue.

The court therefore SETS ASIDE the State Board's final assessments of Thorntown's and Tri–County's distributable property and REMANDS to the State Board for further consideration consistent with this opinion.

(9) *any other information which the board considers relevant.*

IC 6–1.1–8–26(b).